34 F.3d 968
 BLACK HILLS AVIATION, INC., a New Mexico Corporation, Arnold
A. Kolb & Florence A. Kolb, individually, and Florence A.
Kolb, Personal Representative of the Estate of Nathan H.
Kolb, deceased, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 92-2290.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 6, 1994.
 
 1
 H. Vern Payne of the Payne Law Firm, Albuquerque, NM (David B. Hartvigsen, Harold A. Ranquist, and J. Craig Smith of Nielsen & Senior, Salt Lake City, UT, with him on the briefs), for appellants.
 
 
 2
 Thomas K. Pfister, U.S. Dept. of Justice, Washington, DC (Acting Asst. Atty. Gen. Stuart E. Schiffer, U.S. Attys. Don J. Svet, Ronald F. Ross, and Ford C. Ladd, U.S. Dept. of Justice, with him on the briefs), for appellee.
 
 
 3
 Before MOORE and KELLY, Circuit Judges, and VAN BEBBER, District Judge.*
 
 
 4
 VAN BEBBER, District Judge.
 
 
 5
 This case arises out of the September 10, 1987, crash of a civilian aircraft on the White Sands Missile Base in White Sands, New Mexico. An aircraft generally referred to as Tanker 07, owned by Black Hills Aviation, crashed while performing a contract air fire suppression support mission on the White Sands Base. Pilot Nathan Kolb and co-pilot Woodard Miller were killed instantly, and the plane was destroyed. The plane crashed into a mountain in the Red Rio/Oscura area of the missile base; this area was also the testing site for the nondevelopmental evaluation of the Army's Line of Sight Forward Heavy [Missile] System phase of the Forward Area Air Defense System [FAADS Project].
 
 
 6
 Appellants brought this action against the United States under the Federal Tort Claims Act [FTCA], 28 U.S.C. Sec. 1346(b), seeking to recover damages for the wrongful death of Nathan Kolb and for the negligent destruction of the aircraft. Appellants also claim that the government tortiously failed to investigate the cause of the crash, tortiously spoiled and destroyed evidence in the case, committed the tort of trespass to chattel or conversion with regard to the wreckage of the plane, and committed a prima facie tort under New Mexico law.[1] The district court concluded that plaintiff's four claims relating to the investigation and recovery of crash debris were barred by the doctrine of sovereign immunity in that they fell under the exception for discretionary functions in the Federal Tort Claims Act, and concluded that summary judgment in favor of the government was warranted on appellants' wrongful death and negligence claims.
 
 
 7
 The plaintiff-appellants appeal from the district court's order of October 26, 1992, dismissing all causes of action brought against the defendants. Appellants argue that the district court erred in dismissing their first four causes of action pursuant to the discretionary function exception of the Federal Tort Claims Act, and that the district court erred in finding there were no genuine issues of material fact which precluded summary judgment in favor of the defendants on the remaining two causes of action for negligence and wrongful death. Appellants also raise a secondary issue concerning whether a presumption of unfavorability should have been imposed against the government by the district court based upon the alleged spoliation of evidence. We exercise jurisdiction under 28 U.S.C. Sec. 1291 and affirm.
 
 I. Background
 
 8
 The United States Army White Sands Missile Range is a restricted military installation approximately 135 miles long and forty miles wide located in New Mexico. The missile range, its air space, and activities conducted there are highly controlled and secured. Civilians do not have access to it except as the Army permits on a case-by-case basis. Between August 1, 1987, and October 10, 1987, the Army and the Department of Defense conducted a series of ground-to-air missile tests for the Forward Area Air Defense System [FAADS Shoot-Off].
 
 
 9
 As a part of the FAADS Shoot-Off, the Department of Defense contracted with Black Hills Aviation on August 26, 1987, for aerial fire suppression services. Black Hills Aviation is a privately-owned, civilian aviation company.
 
 
 10
 At approximately 3:00 p.m. on September 10, 1987, the Army called Black Hills Aviation to suppress a fire started by a FAADS missile. The missile was fired more than two hours before the crash. A P2V aircraft, Forest Service Number N96271 ["Tanker 07"], owned by Black Hills, was dispatched in response to the request for aerial fire suppression. Tanker 07 was piloted by Nathan Kolb and co-piloted by Woodard Miller, employees of Black Hills Aviation who were not Department of Defense personnel.
 
 
 11
 Nathan Kolb had been licensed by the FAA as an Instrument Rated Commercial Pilot since September 23, 1983, and as a Multi-Engine Instrument Rated Commercial Pilot since July 18, 1985. The September 10, 1987, flight was Nathan Kolb's first fire suppression drop as a pilot-in-command of a slurry bomber such as Tanker 07 without an instructor on board the aircraft. Co-pilot Woodard Miller was an experienced pilot of over forty years and had been an FAA Type Rated Pilot-in-Command for retardant tankers for more than thirteen years. He was an FAA licensed flight instructor for nearly thirty years.
 
 
 12
 Tanker 07 obtained authorization to enter the missile range's airspace from the missile range air controller. During the flight, Tanker 07 crashed on the missile range and both pilots were killed. The crash site was located approximately fifteen miles into the interior of the missile range, and was inside the testing site for the FAADS Project.
 
 
 13
 Following the crash, an attorney from the Army Judge Advocate General's [JAG] Office at the missile range ordered markers to be placed at the crash site, and aerial photographs were taken. At that time, the Army JAG Officer anticipated litigation regarding the crash. Personnel at the missile range contacted the National Transportation Safety Board [NTSB] and the Army Safety Center in Fort Rucker, Alabama, and inquired whether either of these entities wished to investigate the crash. The NTSB replied that it was not interested in investigating, but would do so if specifically requested to do so by the missile range. Neither entity actually investigated the crash.
 
 
 14
 Colonel Gary Epperson of the missile range was appointed to conduct an Army Regulation 15-6 Collateral Investigation into the facts and circumstances of the crash. The scope of the AR 15-6 investigation encompassed only the activities of the Army in regard to the crash of Tanker 07, and did not seek to determine the precise cause of the crash. Colonel Epperson's investigation consisted of viewing the crash scene, meeting with eyewitnesses to the crash, and asking for written statements.
 
 
 15
 Arnold Kolb, father of Nathan Kolb and owner of Tanker 07, requested access to the crash site and was allowed the following: (1) an overflight of the crash site on September 11, 1987; (2) a visit to the crash site in its undisturbed state with Colonel Edgar Williams, the Public Affairs Officer at the missile range, on September 23, 1987; (3) a visit to the crash site in late February, 1988, to disassemble the landing gear of Tanker 07; and (4) a visit to the crash site area in late March, 1988, to pick up the wreckage of tanker 07 that had been airlifted to a range road. In addition, Mr. Kolb made a visit to the crash site in early December, 1987, as a guest on a missile range hunting pass. Missile range officials were not aware of this visit.
 
 
 16
 During his September, 1987, visit to the crash site, Arnold Kolb was told that the Army was conducting an investigation. On September 14, 1987, Colonel Epperson released the crash site to allow the FAADS Shoot-Off to resume. Appellants contend that a clean-up of the crash site began sometime between September, 1987, and December, 1987, and appellees contend that the crash wreckage remained at the crash site until February, 1988.
 
 
 17
 In February, 1988, after allowing Arnold Kolb access to the crash site to disassemble the landing gear, and after obtaining Arnold Kolb's consent, the Army used explosives to break the wreckage into smaller pieces so that it could be sling-loaded under a helicopter and brought down to a road for Arnold Kolb to recover. The Army did not allow the Kolbs to perform their own investigation of the undisturbed crash site or participate in the Army's investigation. The Kolbs did not learn that the Army's investigation had not sought to determine the cause of the crash until after the Kolbs received the AR 15-6 investigation report, which was completed on December 7, 1987.
 
 
 18
 The Kolbs personally retained a team of aircraft accident investigation experts to conduct an analysis of the crash debris. The experts found some evidence that an external force had affected Tanker 07 prior to the aircraft's crash. The evidence included a conical shaped piece of metal found in the lower right side of the co-pilot's back during the autopsy. No part of Tanker 07 matched the conical shaped piece of metal. Additionally, there were markings on a turbine blade in the right jet engine of Tanker 07 which were indicative of an event occurring on the right side of Tanker 07 just prior to the crash.
 
 
 19
 During the course of this litigation, appellants took depositions from numerous eyewitnesses to the crash, as well as others. One eyewitness stated that the right wing of Tanker 07 fell apart shortly before the crash. Another testified that Tanker 07 tilted slightly up, as if trying to climb, prior to the crash. A third eyewitness stated that Tanker 07 lost 200 to 300 feet of altitude just prior to the crash. Discovery in the case disclosed that the area in which Tanker 07 crashed had no scheduled or actual missile launches, that the airspace was protected, that there were no activities taking place in areas adjacent to the crash site involving the firing of live ordnances or missiles, and no witnesses saw any indication that a projectile or missile struck Tanker 07 before it crashed.
 
 II. Standards of Review
 
 20
 We review de novo the district court's dismissal of appellants' first four causes of action pursuant to the discretionary function exception of the Federal Tort Claims Act under Fed.R.Civ.P. 12(b)(1). Wheeler v. Hurdman, 825 F.2d 257, 260 (10th Cir.), cert. denied, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987). Additionally, we review the district court's ruling on summary judgment de novo, applying the same standard as the district court. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." Russillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir.1991). Any evidence tending to show triable issues will be viewed in the light most favorable to the nonmoving party. Bee v. Greaves, 744 F.2d 1387, 13396 (10th Cir.1984), cert. denied, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).
 
 III. The Discretionary Function Exception
 
 21
 The district court dismissed appellants' first four causes of action under the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. Sec. 2680(a). The FTCA waives the sovereign immunity of the United States Government with respect to certain claims for personal injuries caused by government employees. 28 U.S.C. Sec. 2671 et seq. Under the Act, the federal government can be held liable "in the same manner and to the same extent as a private individual under like circumstances." Id. Sec. 2674. However, the FTCA includes an exception to this waiver of sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. at 2680(a). The Supreme Court has characterized section 2680(a) as "the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). Its application is a threshold jurisdictional issue in any case brought under the FTCA. Johnson v. United States, Dep't of Interior, 949 F.2d 332, 335 (10th Cir.1991).
 
 
 22
 The determination of whether the discretionary function exception applies to a particular act involves a two-pronged analysis by the court. Berkovitz v. United States, 486 U.S. 531, 536-37, 108 S.Ct. 1954, 1958-59, 100 L.Ed.2d 531 (1988). First, in order for the exception to apply, the act must "involve an element of judgment or choice." Id. at 536, 108 S.Ct. at 1958. Under this first prong, we must determine whether a specific and mandatory regulation, statute or policy requires a particular course of action. Id. If such a statute or regulation is applicable, there is no discretion involved and the discretionary function exception does not apply. Id. If, on the other hand, the government's conduct is not controlled by a such a directive, the court must proceed to the second prong of analysis and determine whether the discretion involved in the governmental act "is the kind that the discretionary function was designed to shield." Id. at 537, 108 S.Ct. at 1959. The exception was designed to protect only discretion "based upon considerations of public policy." Id. at 537, 108 S.Ct. at 1959. This interpretation of the exception is based upon Congress' desire to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig Airlines, 467 U.S. at 814, 104 S.Ct. at 2764.
 
 
 23
 In the case at hand, appellants' first four causes of action are all based on the Army's investigation of the crash of Tanker 07 and the resultant disposal of the crash debris. Appellants allege that the government tortiously failed to investigate the cause of the crash, tortiously spoiled and destroyed evidence in the case, committed the tort of trespass to chattel or conversion with regard to the Army's treatment of the plane wreckage, and committed a prima facie tort under New Mexico law.[2] Appellants argue that the Army was obligated to perform an investigation into the cause of the Tanker 07 crash by certain Army regulations, and that the discretionary function exception to the FTCA is therefore not applicable to the Army's actions surrounding the investigation of Tanker 07 and the disposition of crash debris.
 
 
 24
 Appellants point to three Department of Defense and Army regulations which they contend establish mandatory investigation requirements applicable to the crash of Tanker 07. These include Department of Defense Instruction 6055.7 [DoD Instruction 6055.7], Army Regulation 385-40 [AR 385-40], and Department of the Army Pamphlet 385-95 [DA Pam 385-95]. DoD Instruction 6055.7 establishes basic accident investigation criteria and requires each branch of the military to promulgate specific regulations implementing it. AR 385-40 and DA Pam 385-95 are regulations which implement and support DoD Instruction 6055.7.
 
 
 25
 The regulations cited by plaintiffs address three different types of investigations. The first type of investigation is known as a "Legal Mishap Investigation." DoD Instruction 6055.7(E)(2)(a)(2)(c). Legal investigations are to be performed if specified factors, such as a death, are involved. This type of investigation is done to determine responsibility for an accident. The second type of investigation addressed in the regulations is often referred to as a "safety" investigation, and encompasses "Limited Use Mishap" and "General Use Mishap" Investigations. DoD Instruction 6055.7(E)(2)(a)(2)(a)-(b). The stated purpose of safety investigations is to prevent reoccurrence of mishaps. The third type of investigation addressed in DoD Instruction 6055.7 is known as an "AR 15-6" Investigation. An AR 15-6 investigation is done to provide a commander with information, and its use, scope, and requirements are discretionary. An AR 15-6 investigation was the only type of investigation performed by the government after the crash of Tanker 07.
 
 
 26
 At the district court level, the government argued and the court agreed that neither a legal investigation nor a safety investigation was required after the crash of Tanker 07, because the applicable regulations only mandate such investigations in the case of a "DoD Mishap." The district court further held that the crash of Tanker 07 did not fall under the definition of a DoD Mishap. Based upon its conclusion that no legal or safety investigation was mandated by Army or DoD regulations, the district court went on to address the second prong of the discretionary function analysis. It ultimately concluded that the government's actions concerning the investigation of the crash and the treatment of crash wreckage were discretionary acts motivated by considerations of public policy. The discretionary function exception therefore applied to shield the government from any liability resulting from the investigation and subsequent treatment of crash debris.
 
 
 27
 Appellants contend that the district court erred in its conclusion that neither a legal nor a safety investigation was mandated after Tanker 07's crash. First, appellants argue that a legal investigation was mandatory for any "mishap" meeting certain criteria, and that the crash of Tanker 07 met those criteria. Second, appellants argue that the crash of Tanker 07 met the definition of a DoD Mishap which required both a legal and a safety investigation given the particular circumstances of the crash.
 
 
 28
 In support of their first argument, appellants point to the language of DoD Instruction 6055.7(E)(2)(a)(2)(c) concerning legal investigations, which reads:
 
 
 29
 DoD Components shall prepare this type of investigation report, in addition to any authorized Limited Use Mishap [Safety] Investigation Report, whenever a mishap involves one or more of the following:
 
 1. Fatality
 
 30
 2. Anticipated litigation for or against the government or a government contractor ...
 
 
 31
 (emphasis added).
 
 
 32
 Based upon the regulation's use of the word "mishap" without qualification, appellants contend that the mandate to perform legal investigations is not limited to DoD Mishaps. Appellants further argue that because the crash of Tanker 07 involved two fatalities, and because a JAG lawyer on the missile range testified that he anticipated litigation when he first cordoned off the crash site on September 10, 1987, a legal investigation was mandated by the regulation.
 
 
 33
 The government has responded by arguing that language elsewhere in DoD Instruction 6055.7 makes clear that the regulation is intended to apply only to DoD Mishaps, and that the district court correctly determined the regulation to be applicable only to those incidents meeting the definition of a DoD Mishap. The government notes that the beginning of section (E)(2) of DoD Instruction 6055.7--which precedes the language quoted by appellants--states: "Minimum reporting and recordkeeping requirements for DoD mishaps follow." (emphasis added) Thus, the government contends that on its face, DoD Instruction 6055.7 applies only to DoD mishaps. We agree. This type of prefatory language would not have been included by the drafters of the regulation unless the drafters intended the entire regulation to apply to DoD Mishaps.[3]
 
 
 34
 Assuming that DoD Instruction 6055.7 and its mandatory legal and safety investigation provisions apply only to DoD Mishaps, appellants argue in the alternative that the crash of Tanker 07 does qualify as a DoD Mishap. Specifically, appellants contend that the crash of Tanker 07 falls within the definition of a DoD Mishap set out in DoD Instruction 6055.7, Attachment 2, Definition 1. This provision defines a DoD Mishap as:
 
 
 35
 An unplanned event, or series of events, which results in damage to DoD property; occupation illness to DoD military or civilian personnel; injury to DoD military personnel on or off duty; injury to on duty civilian personnel; damage to public and private property or injury and illness to non-DoD personnel as a result of DoD operations.
 
 
 36
 Appellants specifically argue that the crash of Tanker 07 qualifies as a DoD Mishap because it meets the last criteria in the definition: it was an unplanned event which resulted in damage to public and private property or injury and illness to non-DoD personnel as a result of DoD operations.
 
 
 37
 The district court concluded that the crash of Tanker 07 did not fall within the definition of a DoD Mishap. Specifically, the court concluded that the crash of Tanker 07 was not a result of a DoD operation because a DoD aircraft was not involved, and because the crash was not an Army aircraft accident as defined in AR 385.40. AR 385.40, which is the Army's implementing regulation for DoD Instruction 6055.7, defines Army aircraft as aircraft operated and exclusively controlled or directed by a member of the Army. Civil aircraft owned by civil operators and accomplishing air contract missions for the Army are specifically excluded from the definition of Army aircraft. AR 385-40, Ch. 4-2(b)(2). Appellants argue that the district court's reliance on the definitions in the implementing regulations was misplaced, and that the court should have concluded that the crash of Tanker 07 was a DoD mishap because it was directly connected with a DoD operation, the FAADS Shoot-Off.
 
 
 38
 Appellants contend that the phrase "as a result of DoD operations," as used in the definition of DoD Mishap, should be interpreted to mean an event having a "direct connection with a DoD operation." The "connected with" definition proposed by plaintiffs would be broad enough to encompass the crash of Tanker 07. Appellants further argue that interpreting the phrase to mean an event "caused by a DoD operation" would not be correct. Appellants cite the Webster's New International Dictionary definition of "result" in support of their proposed definition: "To proceed, spring, or arise, as a consequence, effect, or conclusion; to come out ..." Unabridged Webster's New International Dictionary, (2d ed. 1957).
 
 
 39
 We conclude that the definition of "DoD Mishap" does not cover the crash of Tanker 07. The only basis upon which the crash could be deemed to be a DoD mishap would be if it the crash was "as a result of DoD operations." In interpreting the phrase "as a result of DoD operations" we first look to the language of the regulation. Good Samaritan Hosp. v. Shalala, --- U.S. ----, ----, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993) (the starting point in interpreting a statute is its language). The use of the plain language--"as a result of"--is logically interpreted to mean "caused by." Interpreting the phrase to mean "connected with" as appellants suggest would be giving the phrase a broader interpretation than its common usage.
 
 
 40
 Moreover, we conclude that the district court correctly looked to the implementing Army regulation, AR 385-40, to help determine whether the crash of Tanker 07 was a DoD Mishap. Although not cited by the district court or the parties to this action, we note that AR 385-40 includes a definition of the phrase "as a result of Army operations" in the Glossary section II, which reads: "Army involvement in an accident event with fault, regardless of degree." This definition is the Army's interpretation of this key phrase, and we owe it considerable deference. See Roberts v. Colorado State Board of Agriculture, 998 F.2d 824, 828 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993). This is a reasonable interpretation, and we have no reason to doubt that a similar interpretation of "as a result of DoD operations" is intended in DoD Instruction 6055.7.
 
 
 41
 Applying this interpretation, the question becomes whether there was Army involvement with fault in the crash of Tanker 07. We conclude that, at least at the time when decisions were made concerning the type of investigation to be performed regarding the crash of Tanker 07 and the preservation or disposition of crash debris, the Army officials making decisions had no reason to conclude that the Army was in any way at fault in the crash of Tanker 07. The AR-15 investigation was conducted by Colonel Epperson in order to determine whether the Army had any involvement with Tanker 07's crash. His investigation led him to conclude that the Army did not contribute to the crash. At the time investigatory decisions were made, there was no reason for Army officials to believe that there was Army involvement with fault in the crash of Tanker 07.
 
 
 42
 We also conclude that the district court was correct to interpret "as a result of DoD operations" in a manner consistent with the Army's policy reasons for conducting legal and safety investigations. DA Pam 385-95 indicates that the Army investigates accidents primarily for the purpose of preventing future accidents which could imperil the Army's combat readiness. The crash of a civilian contract aircraft--absent some indication of Army fault in the crash--would not be an accident event which would give the Army insight into the prevention of other such accidents.
 
 
 43
 Based upon the foregoing analysis of the phrase "as a result of DoD operations," we conclude that the crash of Tanker 07 was not a DoD Mishap for which a legal or safety investigation was mandated by DoD Instruction 6055.7. Similarly, we conclude that neither AR 385-40 nor DA Pam 385-95 mandated a particular course of investigation into the crash of Tanker 07. Because no mandatory regulation applied, the scope and manner of the investigation of the crash was discretionary, and we move on to the second prong of the discretionary function analysis.
 
 
 44
 In order to reach a final conclusion concerning the applicability of the discretionary function exception to the Army's investigative decisions, we must decide whether the discretion involved in the governmental act "is the kind that the discretionary function was designed to shield." Berkovitz v. United States, 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). The exception was designed to protect only discretion "based upon considerations of public policy." Id. Here, appellants argue that decisions made by Army officers concerning the investigation of the crash of Tanker 07 and the subsequent disposition of the crash debris were not motivated by considerations of public policy. The district court held that the decisions made by governmental actors concerning the investigation of the crash of Tanker 07 were the sort of policy decisions that Congress intended to protect because the investigatory decisions were based upon the officers' balancing of (1) the Army's policy to use its limited resources to investigate accidents within its control, (2) the Army's lack of expertise to investigate technical aspects of the crash, and (3) the Army's desire to get on with missile testing as soon as possible and without interference.
 
 
 45
 In fact, appellants argued before the district court and in their briefs on appeal that the Army's decision not to attempt to determine the cause of the crash of Tanker 07 "appears to have been made out of a strong desire to resume the FAADS Shoot-Off missile tests as soon as possible." This type of military decision is precisely the sort of policy-based decision protected by the discretionary function exception. See Boyle v. United Technologies Corp., 487 U.S. 500, 511, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988). In Boyle, the Supreme Court held that the selection of the appropriate design for military equipment is "assuredly" a discretionary function within the meaning of 28 U.S.C. Sec. 2680(a) because it involves the "balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." Id. Similarly, the decisions made by the officers on the White Sands Missile Base concerning the AR 15-6 investigation of the crash of Tanker 07 involved a trade-off between a more complete investigation into the cause of the crash and the resumption of important military missile tests. The decisions made concerning the scope of the investigation, the subsequent release of the crash site, and the return of the crash debris are all decisions protected by the discretionary function exception. Therefore, because appellants' first four tort claims were based upon the reasonableness of these decisions, they were properly dismissed by the district court.
 
 
 46
 In a similar vein, the district court correctly concluded that decisions by officers at the White Sands Missile Base concerning the Kolbs' access to the crash site on the missile base were obviously decisions grounded in military policy which are not to be second-guessed by the courts. See United States v. Gourley, 502 F.2d 785, 785-87 (10th Cir.1973) (it is well-recognized that the commander of a military installation has the broad authority and discretion to summarily exclude persons therefrom). Appellants' argument that there was no reason to exclude Arnold Kolb at certain times is simply an argument based upon the reasonableness of the military's exercise of its discretion and is barred by the discretionary function exception to the FTCA. 28 U.S.C. Sec. 2680(a) (protects exercise of a discretionary function "whether or not the discretion involved be abused").
 
 
 47
 In light of our conclusions concerning the lack of error in the district court's dismissal of appellants' claims against the government, we do not reach appellants' secondary argument concerning the imposition of a presumption of unfavorability against the government regarding evidence that was spoiled by the government's investigatory decisions. It would be nonsensical for a court to hold that a government actor's decisions were protected under the discretionary function exception to the FTCA, then to turn around and apply a presumption of unfavorability against the actor.
 
 
 48
 Before moving on to a discussion of the appropriateness of summary judgment on appellants remaining claims, we briefly address appellants' argument concerning the applicability of the "Good Samaritan" Doctrine to the investigation of the crash site and disposition of crash debris. Appellants contend that the district court erred in not considering the "Good Samaritan" Doctrine's applicability to the governmental actors' decision to investigate the crash of Tanker 07. Under this doctrine, once one assumes the duty to act towards a particular person, and engenders reliance thereon by that person, there is then a legal obligation to act with care and an obligation not to worsen the situation. Restatement (Second) of Torts Secs. 323, 324, 324A. Appellants argue that once the Army decided to perform some investigation into the crash of Tanker 07, the Kolbs relied upon that decision, and the Army was obligated to perform the investigation in a non-negligent manner.
 
 
 49
 We reject appellants' argument concerning the applicability of the "Good Samaritan" Doctrine for several reasons. First of all, we conclude that the scope of the investigation was motivated by public policy concerns and is thus protected by the discretionary function exception to the FTCA. Second, the law of this Circuit is clear that the discretionary function exception applies even in situations where the government undertakes a duty and breaches the duty, if nothing more than negligence would be established by the breach. Barnson v. United States, 816 F.2d 549, 554 (10th Cir.), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). We find inapposite the case relied upon by appellants, Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), where the government was found liable under the "Good Samaritan" Doctrine. In Indian Towing, the government conceded that the discretionary function did not apply and the government was found liable based upon its negligent provision of light house services. Id. We find no error in the district court's failure to consider the "Good Samaritan" Doctrine.
 
 IV. Summary Judgment on Counts V and VI
 
 50
 The district court granted summary judgment on appellants' causes of action for wrongful death and negligence in the destruction of Tanker 07, Counts V and VI, based upon plaintiff's inability to establish a genuine issue of material fact concerning the government's involvement in the crash of Tanker 07. The district court held that despite appellants' experts' opinions indicating that some sort of force struck Tanker 07 before it crashed, there was no evidence whatsoever indicating that any act or negligence of the United States caused the crash. The district court rejected appellants' argument that the court could infer that the negligence of the defendant caused the crash based on the doctrine of res ipsa loquitur. We find no error in the district court's conclusions and affirm the dismissal of appellants' remaining claims.
 
 
 51
 Reviewing the facts in the light most favorable to appellants, we assume that appellants could prove that some sort of force struck or affected Tanker 07 prior to its crash. However, appellants failed to present the district court with any evidence establishing that any such outside force was the result of negligence of the United States or that the United States in any way caused the crash. Appellants' reliance on the doctrine of res ipsa loquitur to prove the negligence of the United States is misplaced and the district court correctly applied New Mexico law on this issue. Under New Mexico law, negligence may be inferred when a plaintiff can prove: (1) that the injury or damage was proximately caused by an instrumentality or occurrence under the exclusive control and management of the defendant; and (2) that the event causing the injury or damage was of a kind which does not ordinarily occur in the absence of negligence on the part of the person in control of the instrumentality. Trujeque v. Service Merchandise Co., 117 N.M. 388, 872 P.2d 361, 364 (1994). Appellants' experts were unable to testify what sort of force struck the plane, where that force came from, when it happened, or how the force caused the crash. The district court was correct to conclude that there was no basis to conclude that any force was under the exclusive control of the United States, particularly in light of the United States' evidence that there were no accidental missile firings on the base at the time of Tanker 07's crash, and that there were no military activities that might have interfered with the flight of Tanker 07. Appellants were simply unable to prove that the accident would not have occurred but for the negligence of governmental employees, and thus the doctrine of res ipsa loquitur is not applicable to establish negligence on appellants' claims for wrongful death and negligent destruction of property.
 
 
 52
 Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable G.T. Van Bebber, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Under New Mexico law, this tort may be a remedy for a wronged party to whom no traditional tort remedies apply. Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726, 734 (1990)
 
 
 [2]
 We are not entirely certain what type of injury plaintiffs' base these claims upon. The violation of a federal regulation in and of itself is not a basis for liability under the FTCA. Klepper v. City of Milford, 825 F.2d 1440, 1448 (10th Cir.1987). However, because the district court did not specifically address the viability of plaintiffs' claims, and because the parties have not argued that issue here, we will confine ourselves to a discussion of the applicability of the discretionary function exception to the FTCA
 
 
 [3]
 It is not disputed that the provisions in DoD Instruction 6055.7 concerning safety investigations apply only to DoD Mishaps because that term is used throughout the safety investigation provisions