Jeffrey Claude CARTER, Plaintiff,

v.

BELL HELICOPTER TEXTRON,
INC. et al., Defendants.

No. Civ 95–416TUC–RMB.

United States District Court,
D. Arizona.

April 21, 1999.

William H. Wimsatt, Los Angeles, CA, Walter Louis Gerash, Denver, CO, for plaintiff.

Roger C. Mitten, Phoenix, AZ, James H. Marburger, Phoenix, AZ, Jill Dahlmann Rosa, Washington, DC, for defendant.

## ORDER

NIELSEN, Chief Judge.

### I. Introduction

Before the Court is Defendant United States' renewed motion to dismiss the spoliation claims against it.[1] It also raises for the first time the discretionary function exception to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346(b). On December 15, 1998, Plaintiffs and Defendants Bell Helicopter and TransTech filed a Notice of Partial Settlement (hereinafter the "Settling Parties"). According to the Government, the Settling Parties now seek to hold the United States responsible under the tort of spoliation of evidence for the Government's 1994 investigation of the accident. Plaintiffs and Defendant TransTech filed objections to the Government's renewed motion. Bell Helicopter filed a joinder with respect to both of these objections.

### II. Background

This lawsuit arises out of the crash of a Bell 206B–III "Jet Ranger" helicopter near Tucson, Arizona. On July 1, 1994, Jeffrey Claude Carter was piloting the Jet Ranger in connection with a firefighting operation in the Pusch Ridge Wilderness area north of Tucson. The helicopter crashed while Carter attempted to deliver an external load containing supplies to a Forest Service fire crew by means of a "long line" suspended beneath the helicopter.

According to Carter, the wind caused the helicopter to rotate sharply. He attempted to drop his load by activating the electrical release switch, but the load failed to release. Carter contends that the hardware connected to the cargo hook failed to release because it jammed on the cargo hook itself, preventing the load from releasing, even though the hook opened properly. The sling load snagged on a rock outcropping causing the main rotor to sever the tailboom. Carter sustained serious burns and permanent injuries for which he seeks compensation.

Carter, and his parents Paul and Clairelaine Carter, bring this suit for strict liability and negligence against Bell Helicopter Textron, Inc., the manufacturer of the helicopter, TransTechnology Corporation ("TransTech"), the manufacturer of the cargo release mechanism and the United States for negligence and for third party spoliation of evidence.

On July 25, 1997, the Court granted, in part, the United States's dispositive motion finding that the Government was a "special employer" and therefore the negligence claims based on the Government's employer status were barred by California's workers compensation exclusivity statute. The Government also argued that it was entitled to judgment as a matter of law because Arizona does not recognize the tort of spoliation. This Court found the spoliation question undecided. It took the Government's motion as to the spoliation issue under advisement and certified the

---

1. The Government's motion is filed post-Answer. As the Government seeks the Court to consider exhibits to its opening brief and to consider factual issues which go to the merits of the claims, the Court will treat the Motion as a Rule 56 motion for summary judgment. *See, e.g., Bonilla v. Oakland Scavenger Co.,* 697 F.2d 1297, 1301 (9th Cir.1982).

spoliation question to the Arizona Supreme Court while staying discovery.

On May 19, 1998, the Arizona Supreme Court found the matter one of "first impression in Arizona." *See Carter v. Bell Helicopter Textron, Inc.*, CV–97–0317–CQ (May 19, 1998). Upon further review, however, the supreme court "determined that it would be both premature and unwise to consider the recognition of a new tort such as this in the abstract on the undeveloped factual record presented." *Id.* Upon receiving the supreme court's decision, this Court lifted the stay and set a new briefing schedule.

In September, 1997, Bell Helicopter and TransTech designated the United States as a non-party at fault under Arizona's Rule 26(b)(5), Arizona Rules of Civil Procedure. By Order of October 1, 1999, this Court held that the United States was a party and no such designation was required. It should be noted that neither Bell nor TransTech asserted cross-claims against the United States.

### III. Stipulated Facts[2]

In July 1994, the United States Forest Service Contracting Officer released the wreckage from the helicopter accident, except for the engine, to the owner of the helicopter, PJ Helicopters. On or about August 1, 1994, Jerry Wallace, the representative of the helicopter owner's insurer, arrived at the Forest Service warehouse in Tucson to take possession of the wreckage on behalf of the owner. Mr. Wallace had previously arranged for Jarman's Air Transport to take custody of the wreckage and to transport the wreckage to Air Transport's storage facility on West Buckeye Road in Phoenix.

Bill Lewis, the acting District Ranger for the Forest Service, was present at the warehouse during the removal of the wreckage by Jerry Wallace and Air Transport's representatives.

At the time of the removal of the wreckage from the Forest Service warehouse, Jerry Wallace took custody of the cargo belly hook to comply with a prior request that he had received from a representative of PJ Helicopters for return of the belly hook.

Air Transport's representative took custody of all remaining items of the wreckage (except for the engine) and transported those items to Air Transport's storage facility on West Buckeye Road in Phoenix, where the items were placed in a fenced and secured storage yard. Included in the items of wreckage placed into storage by Air Transport were the long line, remote hook, and the remains of the cinch rope. The long line and cinch rope were placed in a locked storage shed for safekeeping.

Air Transport subsequently shipped the remote hook to PJ Helicopters, along with the double shackle connectors that had been used to connect the remote hook to the bottom end of the long line at the time of the accident, as depicted in the photographs taken by the Forest Service investigators at the Fenster schoolyard during the accident investigation. The remote hook and double shackles were later photographed and videotaped at PJ Helicopters by plaintiffs' investigator.

Jerry Wallace did not take physical possession of any wreckage other than the belly hook at the time of removal of the wreckage from the Forest Service warehouse.

Air Transport's representative took physical possession of all items of wreckage in the warehouse that were released by the Forest Service, with the exception of the belly hook.

Air Transport transported and placed into storage all items that were released by the Forest Service, with the exception of the belly hook that Jerry Wallace preserved and shipped to PJ Helicopters.

---

**2.** Plaintiffs, Bell Helicopter, TransTech and the United States entered into these stipulated facts for the purpose of resolving the United States' motion to dismiss only and is not binding on any party for any other purpose.

Air Transport retained custody and control of the wreckage and controlled access to the wreckage.

Plaintiff's investigator, Bobby Ross, was the first person to inspect the wreckage after it was placed into storage at Air Transport. Mr. Ross took photographs of the wreckage, including the long line. The photos show that no shackle, clevis, or other hardware was connected to the long line at the time of his inspection.

No shackle or clevis, other than the ones used with the remote hook, has ever been found in the wreckage at Air Transport.

Forest Service photographs taken at the accident site show that a swivel hook was connected to the remote hook, which in turn was connected to the long line immediately after the accident, the long line and remote hook appear in photograph taken by the Forest Service investigators after removal from the accident site to the Fenster School. The swivel hook has not been located since the Forest Service investigation and is not present with the other wreckage at Air Transport. Bill Lewis of the Forest Service does not specifically recall the swivel hook. The Forest Service has not been able to determine the disposition of the swivel hook.

## IV.  Discussion

It is undisputed, that the Government exercised complete control over the site of the accident, all aspects of the investigation, wreckage and the evidence as to what caused the subject accident. *See also* First Amended Complaint at ¶ 46. According to the First Amended Complaint, the Government:

(1) negligently conducted the accident investigation;

(2) failed to preserve the helicopter wreckage;

(3) allowed the deterioration of evidence;

(4) allowed the spoliation of evidence;

(5) failed to adequately or properly photograph, inspect or test equipment and physical evidence at the accident scene;

(6) failed to preserve evidence for others to investigate; and

(7) hid or concealed information and evidence regarding the accident

*See* First Amended Complaint at ¶ 47.

The Government claims that these allegations are essentially claims of spoliation of evidence which Arizona does not recognize. It contends that it will suffer "extraordinary prejudice" if forced to defend against this hypothetical tort with no elements or other factors recognized or defined by the Arizona legislature or state courts. The Government also claims that even given a generous reading of paragraph 47, the Settling Parties fail to state a claim under Arizona's common law negligence principles. Finally, the Government argues that the Court lacks subject matter jurisdiction because the discretionary function exception to the FTCA. This exception, according to the Government, prevents Plaintiffs or Defendants from challenging in a tort suit, the scope of the accident investigation or the release of the crash debris to its rightful owner.

▪ The Government's last argument must be addressed first since the applicability of the discretionary function exception is jurisdictional. *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir.1995). If this Court concludes the discretionary function exception applies, then the issue of whether a viable spoliation claim exists, is moot. *Id.; see also, Black Hills Aviation, Inc. v. United States*, 34 F.3d 968, 977 (10th Cir. 1994) (finding that since the scope of the investigation was motivated by public policy concerns, any spoliation claims were precluded by the discretionary function exception to the FTCA).

### A.  Discretionary Function Exception

▪ The FTCA operates as a waiver of the federal government's sovereign immunity. *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir.1995). The FTCA waives the government's sovereign immunity for tort claims arising out of the negli-

gent conduct of government employees acting within the scope of their employment. *Id.* As is typical of a statutory construct, the FTCA's waiver is subject to several exceptions. One such exception is the "discretionary function exception," which provides as follows:

The provisions of this chapter and section 1346(b) of this title [the FTCA] shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1994). The plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA; the United States bears the ultimate burden of proving the applicability of the discretionary function exception. *Prescott v. United States,* 973 F.2d 696, 702 (9th Cir.1992).

■■■ A two-step analysis is involved in applying the discretionary function exception to the FTCA. First, it must be determined whether "the challenged actions involve an element of judgment or choice." *Sabow v. United States,* 93 F.3d 1445, 1451 (9th Cir.1996). If a federal statute, regulation, or policy prescribes the exact course of action that is to be taken in a situation, then the action in question is not discretionary. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988). To find the conduct non-discretionary, the federal employee must have no choice but to follow the applicable authority. *Id.*

■■■ If the challenged action involves an element of choice, however, then the second step in the analysis is to determine whether the action is "of the kind that the discretionary function exception was designed to shield." *United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991). Actions that fall into this category are those involving "considerations of social, economic, or political policy." *In re Glacier Bay,* 71 F.3d at 1450. If an action involves both an element of choice and falls under the umbrella of actions intended to be covered by the discretionary function exception, then the exception applies and tort relief is barred. *Id.*

■■ The Government recognizes that various statutes, policies and regulations authorize the Forest Service to organize, conduct and control aviation accident investigations. According to the Government, none of these regulations specifically prescribe the particular course of action the investigation must follow. Rather, agency employees are granted "vast discretion" in the manner in which they conduct the investigation. Since no two accidents are the same, the actions of the Government accident investigators, by necessity, involve an element of choice and are constrained by available resources.

The Government argues that the purpose of these investigations is "primarily to determine the probable causes for accidents/incidents." 41 C.F.R. § 101–37.1106(b). Since this conduct protects important "social, economic or political" policies, the Government contends it is the very conduct Congress intended to shield with the discretionary function exception to the FTCA.

The Settling Parties respond that the Government's leap to the "element of choice or judgment" prong is too hasty. The question, they argue, is not the scope of the investigation conducted (i.e. which piece to examine), but with the Government's conduct mandated by statute. According to the Settling Parties, their claim is that the Government failed to return critical evidence which now precludes Plaintiffs from proving a defective product and the settling defendants from proving the opposite.

The critical piece of evidence according to the Settling Parties is the clevis or shackle ("clevis/shackle") that was connected to the top of the long line at the time of the accident. Government photos taken at the accident site and government accident investigator, Gordon Henson's subsequent declaration, confirm that the clevis/shackle was at the accident site when the government investigators conducted their initial investigation. It was then removed along with some of the other wreckage via helicopter long line by the Forest Service investigators to the Fenster schoolyard for further analysis. The investigator laid out the long line at the schoolyard and documented the damage to the long line along its entire length. The reference point for the measurements was the "helicopter (shackle) end of 50–foot leadline." *See* U.S. Ex. E at 114. What happened next to that piece of equipment, however, is unknown.

By July 15, 1994, the Government investigation team was finished and informed the owner, P.J. Helicopter[3] that it could have the wreckage. Meanwhile, the wreckage was placed in a warehouse. On August 1, 1994, Jerry Wallace of American Eagle Insurance Company had Air Transports, a storage facility in Phoenix, take physical possession of the wreckage with the exception of one or two belly hooks. Wallace returned those cargo hooks to P.J. Helicopter, and did not retrieve the remaining wreckage from the mountain. Air Transport transported and placed into storage the wreckage released by the Government.

A little over a year later, in September 1995, Bobby Ross, a representative of Plaintiff Jeffrey Carter flew to the site and recovered much of the remaining wreckage. Ross did not find the clevis/shackle at the storage facility in Phoenix, nor at the accident site.

The Settling Parties argue that the Government was under a statutory obligation to return that critical piece of evidence. Because its obligation was mandatory requiring no discretionary decision making, the exception, they argue, does not apply. According to the Settling Parties, since this critical piece of evidence was lost, it is not possible to know whether the clevis/shackle was the correct attaching device for the 50–foot steel cable to the load arm of the helicopter belly cargo hook. It is also impossible to tell whether Bell's or TransTech's service bulletins adequately address the proper procedures for rigging a load on the cargo belly hook.

The federal regulation relied upon by the Settling Parties states in relevant part:

> Wreckage, records, mail and cargo in the custody of the investigator-in-charge shall be released by an authorized representative of the investigating agency when it is determined that the investigating agency has no further need of such wreckage, records mail or cargo.

41 C.F.R. § 101–37–1106(j)(2) (emphasis added).

The Settling Parties contend that the use of the mandatory term "shall" removes any discretion or judgment as to a government employee's duty to return the wreckage after the investigation. The government employees had no rightful option but to adhere to that directive of the federal regulation and return all of the parts retrieved from the wreckage.

The Settling Parties also note that while one of the stated purposes of the investigation was to "determine the probable cause of the accident," the pertinent federal regulation also requires that "[t]hese investigations *shall* be conducted ... secondarily to obtain and preserve available evidence." 41 C.F.R. § 101–37.1106(b) (emphasis add-

---

**3.** P.J. Helicopters owned the helicopter which it sent to Arizona as part of a subcontract with Rainbow Helicopters. Rainbow had a contract with the United States Department of Interior, Office of Aircraft Services to provide helicopter services to the United States for the 1994 fire season. The helicopter was covered by an insurance policy with American Eagle Insurance Company who than became the owner of the wreckage after the accident.

ed). The Settling Parties conclude that the Government was required by the applicable rule to return the clevis/shackle in order to *preserve* available evidence for Jeffrey Carter who was incapacitated from his injuries.

The Government responds that there is a difference in meaning between "releasing" (a term stipulated to) and "returning" the argument posited by Plaintiffs. A academic question the Court finds unproductive to resolve the question at issue.

The Court concludes that the Settling Parties' interpretation of the regulations at issue is too narrow. First, there is no question that a majority of the misconduct alleged in paragraph 47 of the First Amended Complaint concerns the scope and manner of the investigation. Namely, whether the Government negligently conducted the accident investigation; allowed the deterioration of evidence; or failed to adequately or properly photograph, inspect or test equipment and physical evidence at the accident scene. *See* First Amended Complaint at ¶ 47.

The Ninth Circuit has found that this type of conduct falls within the discretionary act prong because it necessarily entails elements of judgment and choice. *See Sabow*, 93 F.3d at 1453 (finding JAG manual allows "officers discretion in conducting an investigation into a death of non-natural causes"); *Miller v. United States*, 163 F.3d 591, 595 (9th Cir.1998) (finding that even with standards and procedures outlining certain requirements for fire suppression, decisions on how to fight multiple fires fell within discretionary function exception). Similarly, none of the Federal Property Management Regulations or the Forest Service's "Aviation Accident Investigation Report" manual, FS–5700–29 or the C.F.R.'s prescribe the manner in which the investigator-in-charge must conduct the accident. Since no mandatory regulation applies, the scope and manner of the investigation of the crash was discretionary.

The First Amended Complaint also alleges that the Government failed to preserve the helicopter wreckage; allowed the spoliation of evidence; and failed to preserve evidence for others to investigate.[4] The Government argues that this conduct is also protected under the discretionary function exception. In support of its argument, the Government relies on *Black Hills Aviation, Inc. v. United States*, 34 F.3d 968 (10th Cir.1994).

The Court finds *Black Hills* helpful in deciding the reach of the discretionary function exception. In *Black Hills*, a civilian aircraft crashed on the White Sands Missile Base. The aircraft, a Tanker 07, was on a contract fire suppression support mission when it crashed, killing the pilot and co-pilot. The plane was destroyed. The crash occurred at a Army missile testing site. The plaintiffs claimed, *inter alia*, that the government tortiously failed to investigate the cause of the crash, tortiously spoiled and destroyed evidence in the case and committed conversion with regard to the wreckage. The *Black Hills* district court found that these claims were barred since they fell within the discretionary function exception. On appeal, the Tenth Circuit affirmed.

In *Black Hills*, an Army JAG officer anticipated litigation regarding the crash. Thus, the need to preserve the evidence was known prior to the commencement of the accident investigation. An army colonel was appointed to conduct the investigation into the facts and circumstances of the crash. The investigation did not seek to determine the precise cause of the crash. The owner of the Tanker 07, and father of the pilot who was killed, requested access to the crash site and was permitted to visit the site and to disassemble the landing gear. After obtaining consent from the

---

4. The First Amended Complaint also alleges that the Government "hid or concealed information and evidence regarding the accident." *See* First Amended Complaint at ¶ 47. There is no evidence proffered to support that allegation. This allegation fails to state a claim for which relief can be granted.

owner, the Army used explosives to break the wreckage into smaller pieces so that it could be sling-loaded under a helicopter and brought down to a road for the owner to recover. The Army did not allow the owner to perform his own investigation of the undisturbed crash site or to participate in the Army's investigation.

The owner retained his own accident investigation experts to conduct an analysis of the crash debris. The experts found some evidence that an external force had affected the Tanker 07 prior to the crash. The evidence included a conical shaped piece of metal found in the lower right back of the copilot's back during the autopsy. No part of the Tanker 07 matched the conical shaped piece of metal. Additionally, there were markings on a turbine blade in the right jet engine of Tanker 07 which were indicative of an event occurring on the right side of the Tanker 07 just prior to the crash. An eye witness testified that shortly before the crash, the right wing of the aircraft fell apart. There was, however, no evidence of any scheduled or actual missile launches occurring at the time of the accident. Thus, the source of the "external force" or the shrapnel of unknown origin in the co-pilot's back was never determined.

In reviewing the mandatory Department of Defense ("DoD") regulations at issue in *Black Hills,* the Tenth Circuit found them inapplicable because the crash of the Tanker 07 was not the result of DoD operations. In addition, at the time the Army made decisions concerning the type of investigation to be performed and the preservation of the crash debris, it had no reason to believe the Army was at fault in the crash. The Tenth Circuit concluded that because no mandatory regulations applied, the scope and manner of the investigation site and the subsequent return of the crash debris constituted discretionary acts. *Id.* at 975. The Tenth Circuit then found that the decisions of the investigating officer involved a trade-off between a more complete investigation into the cause of the crash and the resumption of important military missile tests. Thus, *Black Hills* held

that the decisions made concerning the scope of the investigation, the subsequent release of the crash site, and the return of the crash debris were decisions protected by the discretionary function exception. *Id. Black Hills* declined to reach the decision as to whether to apply a "presumption of unfavorability" against the government regarding evidence that was destroyed because "[i]t would be nonsensical for a court to hold that a government actor's decisions were protected under the discretionary function exception to the FTCA, then to turn around and apply a presumption of unfavorability against the actor." *Id.* at 977.

Similarly, cases in this circuit have held that the exception applies under equally disturbing facts. In *Sabow v. United States,* 93 F.3d 1445 (9th Cir.1996), a Marine Corps officer died of a gunshot wound. Before his death, there had been an investigation of high-ranking Marine Corps officers concerning the personal use of military aircrafts. The investigation began from an anonymous tip and resulted in the Chief of Staff for marine aircraft operations in the Western United States who was also Colonel Sabow's immediate supervisor, being relieved of his duties. Colonel Sabow was named as the acting Chief of Staff. Colonel Sabow was subsequently informed that he, too, was a possible target of the investigation, although even if the allegations were true, did not appear to be career-threatening. The next morning, Colonel Sabow's wife found him in the backyard dead of a shotgun blast to the head.

The base military police and the Office of the Judge Advocate conducted three investigations and concluded that Colonel Sabow had committed suicide. Not satisfied by the results, the plaintiffs brought suit and alleged, *inter alia,* that the investigations were unprofessional, ineffective and blindly insensitive to the Sabow family. The Sabow complaint alleged that "the crime scene was not secured, important evidence was moved and manipulated be-

fore pictures of the scene were taken, no effort was made to securely handle critical evidence—including the shotgun found at the scene (on which, curiously, no prints of Colonel Sabow were ever found)—and that Mrs. Sabow was subjected to a withering investigative interview without benefit of any support or assistance." *Id.* at 1449 n. 2. In finding the discretionary exception applicable, the Ninth Circuit held that the plaintiffs could not sue the government for allegedly negligent investigation of a military officer's death despite the fact that the allegations, "if true, represent alarming instances of poor judgment and a general disregard for sound investigative procedure." *Id.* at 1455.

The Ninth Circuit has also held that the alleged failures of National Park Service rangers to warn visitors of safety hazards were protected from suit where the challenged action involved balancing safety considerations against competing policy considerations such as leaving areas of a park in its natural state. *Blackburn v. United States,* 100 F.3d 1426 (9th Cir. 1996); *Valdez v. United States,* 56 F.3d 1177 (9th Cir.1995); and *Childers v. United States,* 40 F.3d 973 (9th Cir.1994), *cert. denied,* 514 U.S. 1095, 115 S.Ct. 1821, 131 L.Ed.2d 744 (1995). Contrast these cases with *Faber v. United States,* 56 F.3d 1122 (9th Cir.1995) where the Ninth Circuit found the discretionary function exception inapplicable because the Forest Service failed to follow a specifically prescribed policy to address a common problem of diving accidents in the Tanque Verde Falls area.

It is undisputed that the implementing regulation here regarding the release of the wreckage uses the term *"shall."* The Court recognizes that the use of this term may raise a question of whether the conduct is mandatory. *See In re Glacier Bay,* 71 F.3d at 1452 (regulations which employ suggestive terms such as "should" rather than mandatory terms such as "must" satisfy discretionary prong). This does not mean that all discretion was removed from the government investigators in this case.

As the Ninth Circuit has recognized, "the presence of a few, isolated mandatory provisions does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Sabow,* 93 F.3d at 1453. Rather, if the regulations taken as a whole, represent guidelines for broad policy goals for conducting accident investigations, then the mere use of a mandatory term will not be found to rob a government actor of all discretion, if those goals are attainable only through the exercise of discretion. *See Miller,* 163 F.3d at 594 (The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion.); *Valdez,* 56 F.3d at 1179 (management guidelines, though using mandatory language are only mandatory in the sense that they set forth broad policy goals attainable only by the exercise of discretion).

Under the Federal Property Management Regulations, 41 C.F.R. pt. 101 (1994), the agency using an aircraft that is involved in an accident has the authority to conduct the investigation of the accident. The Forest Service appointed an accident investigation team on the day of the accident which had as its objective to determine the cause of the accident in order to prevent a similar accident in the future. *See* United States Forest Service Manual, § 6730.2.

The Court concludes that the manner in which this investigation was conducted, including the release (or return) of the wreckage, necessarily required the use of judgment. First, a decision based on government resources had to be made as to whether to retrieve *any* wreckage from the steep mountainside. How to retrieve the wreckage from the schoolyard and where to store it was also discretionary. The decision to release the wreckage to Air Transport without providing or requiring an itemized list was also discretionary. Thus, while the government was required to release the wreckage, the manner and the extent to which it did so involved deci-

sion making and choice. In fact, the Government could have left the wreckage on the mountainside and left it to the owner to retrieve. Finding these acts satisfy the discretionary act prong does not end the inquiry.

### B. Policy Considerations

The second step of the two-part discretionary function test is to determine whether the alleged conduct involves considerations of social, economic or political policy. That is, whether the discretion required the type of judgment that the exception is designed to shield. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954, 100 L.Ed.2d 531.

Here, the primary purpose of the accident investigation was to prevent similar accidents in the future. Secondarily to that, was to obtain and preserve factual evidence. This conduct has broad social and economic policy considerations. Congress intended to shield the scope of accident investigations form tort lawsuits. Otherwise, the goal of accident prevention and air safety would be subjected to hindsight analysis and chill investigative discretion.

Here, an accident investigation team of seven convened on the mountainside the day after the accident, in the heat of an Arizona summer. Temperatures during that time were well above 100 degrees. The team sought to determine the cause of the accident by interviewing the witnesses while the events were fresh. It divided work assignments and performed aerial surveillance of the accident site based on the allocation of resources. The investigation team recorded the session and took photographs as best they could given the steep terrain and rock outcroppings. The team decided to retrieve some of the wreckage by helicopter long line. The team concluded that the accident was due to pilot error and focused their limited resources on investigating the flight and the pilot. Although they had the option of calling the various equipment manufacturers, the investigators felt it unnecessary because of their conclusion as to the cause of accident. There is no evidence, not that it would make a difference, that they intentionally decided not to focus their efforts on the cargo release mechanisms. A few days later, the wreckage was released to the insurance company. This is the type of conduct which requires judgment, furthers significant public policy and economic concerns and should not be subjected to judicial second-guessing. The Court concludes that since the discretionary function exception applies, no tort suit may be maintained against the United States. Accordingly, the question of whether Arizona will recognize the tort of spoliation of evidence is moot.

### V. Conclusion

Based on the foregoing,

**IT IS ORDERED** that the United States' "Motion to Dismiss or in the alternative, Motion for Summary Judgment" (Docket # 90) and the "Motion of Defendant United States of America to Dismiss the Spoliation Claims" are **GRANTED;**

**IT IS FURTHER ORDERED** that pursuant to the Stipulation of Settlement filed December 15, 1998, the trial date of September 28, 1999 is **VACATED;** the parties shall file their Stipulation for Dismissal and form of order within thirty days of receipt of this Order. DATED this 20th day of April, 1998.

