# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 18-4489

LUTHER D. SPICER, JR., APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued September 29, 2020                              Decided September 14, 2021)

*Christopher Glenn Murray*, with whom *John D. Niles* and *Barton F. Stichman* were on the brief, all of Washington, D.C., for the appellant.

*Bobbiretta E. Jordan*, with whom *William A. Hudson, Jr.*, Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; *Kenneth A. Walsh*, Deputy Chief Counsel; and Jessica K. Grunberg, Senior Appellate Attorney, were on the brief, all of Washington, D.C., for the appellee.

Before PIETSCH, ALLEN, and TOTH, *Judges*.

TOTH, *Judge*, filed the opinion of the Court. ALLEN, *Judge*, filed a dissenting opinion.

TOTH, *Judge*: Veteran Luther D. Spicer, Jr., served in the U.S. Air Force from May 1958 to September 1959. The Board denied him compensation for a bilateral leg disability, primarily characterized by weakness and instability from arthritis in both knees. Before the Agency, Mr. Spicer sought compensation for this disability on the theory that it was secondary to his service-connected leukemia. But he did not contend that leukemia caused his bilateral leg disability; nor did he argue that leukemia aggravated it—that is, made it worse. Instead, he maintains that he should be compensated for the current level of functional impairment because treatment he received for his leukemia prevented him from undergoing surgery that could potentially alleviate his bilateral leg disability. Relying on VA's secondary-service-connection regulation, the Board determined that the law didn't authorize disability compensation on such a theory.

On appeal, Mr. Spicer argues that, notwithstanding any regulation, the statute that establishes basic entitlement to VA disability compensation authorizes service connection in these circumstances. Because we conclude that the statutory language at issue does not direct VA to provide compensation absent causation or aggravation, we affirm.

# I. BACKGROUND

## A.

This case turns on some fundamental principles governing the award of VA disability compensation. "Basic entitlement" is spelled out in 38 U.S.C. § 1110, which presently provides:

> For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, air, or space service, during a period of war, the United States will pay to any veteran thus disabled and who was discharged or released under conditions other than dishonorable from the period of service in which said injury or disease was incurred, or preexisting injury or disease was aggravated, compensation as provided in this subchapter, but no compensation shall be paid if the disability is a result of the veteran's own willful misconduct or abuse of alcohol or drugs.

38 U.S.C. § 1110.[1] Congress further specified that a "preexisting injury or disease will be considered to have been aggravated by active military, naval, air, or space service, where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease." 38 U.S.C. § 1153. These provisions lay out what's come to be known as the "direct" theory of service connection. In general, under this theory, the evidence establishes "that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein." 38 C.F.R. § 3.303(a) (2021).

No statute expressly provides for secondary service connection, where compensation for a disability is not related directly to service but to problems that themselves stem from service. *See Frost v. Shulkin*, 29 Vet.App. 131, 137 (2017). Instead, this theory of entitlement is set forth in a longstanding regulation, 38 C.F.R. § 3.310, which was first promulgated in 1930.[2] Under this rule, VA recognizes that "disability which is proximately due to or the result of a service-connected disease or injury shall be service connected" as "a secondary condition." 38 C.F.R. § 3.310(a)

---

[1] Technically, because Mr. Spicer's service from 1958 to 1959 did not fall within "a period of war," *see* 38 U.S.C. § 101(9), (11), the statute governing his case is not section 1110 but 38 U.S.C. § 1131, which covers veterans who served "during other than a period of war." Save for the wartime/peacetime distinction, these two statutes are "identical in all respects." *Gilpin v. West*, 155 F.3d 1353, 1356 (Fed. Cir. 1998). So, for simplicity's sake and consistent with the parties, we'll focus our analysis on section 1110.

[2] *See* VA RULE & PROCEDURE 1103 (1930) ("Disability compensation will accordingly be payable in all cases where, from a medical standpoint, the present disability may reasonably be considered to be the result of the natural progress of a properly service connected disease or injury, unless such finding is clearly negative by specific evidence of an intervening cause."); *see also id.* (permitting compensation for a post-service disability "when such disability is proximately due to or is the natural progress of a properly service connected injury or disease").

(2021). Following our en banc decision in *Allen v. Brown*, 7 Vet.App. 439 (1995), VA promulgated subsection (b), which states:

> Any increase in severity of a nonservice-connected disease or injury that is proximately due to or the result of a service-connected disease or injury, and not due to the natural progress of the nonservice-connected disease, will be service connected. However, VA will not concede that a nonservice-connected disease or injury was aggravated by a service-connected disease or injury unless the baseline level of severity of the nonservice-connected disease or injury is established by medical evidence created before the onset of aggravation or by the earliest medical evidence created at any time between the onset of aggravation and the receipt of medical evidence establishing the current level of severity of the nonservice-connected disease or injury. The rating activity will determine the baseline and current levels of severity under the Schedule for Rating Disabilities . . . and determine the extent of aggravation by deducting the baseline level of severity, as well as any increase in severity due to the natural progress of the disease, from the current level.

38 C.F.R. § 3.310(b).

## B.

In April 2013, the VA regional office (RO) granted Mr. Spicer service connection for chronic myeloid leukemia and assigned a 100% disability rating. Four years later, he filed a claim for bilateral leg weakness and instability, asserting that it was secondary to his service-connected leukemia. A VA examiner confirmed bilateral knee degenerative arthritis, noted the functional limitations caused by the disease, and acknowledged Mr. Spicer's contention that his arthritis was linked to leukemia. But she opined against that theory, citing medical literature to support that arthritis was not a known symptom of leukemia.

Shortly thereafter, the RO denied service connection for the bilateral leg disability. Mr. Spicer disagreed and advised that he had essentially "lost use" of his legs and that he could not undergo surgery on them because of his leukemia. R. at 52. As he later clarified, his scheduled 2013 bilateral knee replacement surgery was canceled because the chemotherapy he was undergoing to treat leukemia had so depressed his hematocrit—red blood cell level. R. at 24. Moreover, he was told that his hematocrit level would "never" rise to a level that would permit him to have such surgery. *Id.*

In the August 2018 decision on appeal, the Board found that the "record does not reflect any proximate aggravation, or worsening beyond natural progression, of the [v]eteran's knee arthritis by his leukemia; or that the knee arthritis is proximately due to, or the result of, his service-connected leukemia." R. at 6. As for the nexus theory proffered by the veteran, the Board

3

concluded that the "inability to undergo knee replacement surgery because of the effects of his service-connected leukemia is not contemplated by the applicable laws or regulations to fall within the meaning of secondary service connection." *Id.* (citing 38 C.F.R. § 3.310). For this reason, the Board denied secondary service connection for the bilateral leg disability. This appeal followed.

## II. ANALYSIS

As noted above, VA will grant service connection for "[a]ny increase in severity of a nonservice-connected disease or injury that is proximately due to or the result of a service-connected disease or injury, and not due to the natural progress of the nonservice-connected disease." 38 C.F.R. § 3.310(b). Mr. Spicer doesn't dispute the Board's conclusion that, under the terms of § 3.310, he is not entitled to service connection for his bilateral knee disability;[3] he contends instead that portions of the regulation are invalid because they make the regulation more restrictive than the statute it implements, section 1110. Pressing that argument, he asserts that section 1110 only requires a worsening of functionality; why that worsening occurred—whether through an inability to treat or a more "etiologically" direct cause—is irrelevant in his view. Appellant's Br. at 8. That the chemotherapy for service-connected leukemia "has worsened his functional impairment from his bilateral knee arthritis, by preventing arthroplasty to treat his arthritis," Mr. Spicer's asserts, "suffices to entitle him to service connection for the worsening of his lower leg disabilities." *Id.*

### A.

Mr. Spicer maintains that the plain language of section 1110 supports a cause-less relationship. Specifically, he contends that the parts of § 3.310(b) on which the Board relied are invalid because they cannot square with section 1110's mandate that the government "will pay" a veteran for disability "resulting from personal injury suffered or disease contracted in line of duty." Absent a specific definition, we understand a statute's words to carry the "ordinary, contemporary, common meaning" they bore at the time the statute was enacted. *Ravin v. Wilkie*, 31 Vet.App. 104, 109 (2019) (en banc).

---

[3] Although Mr. Spicer contends that the Board failed to address whether chemotherapy caused or worsened his knee arthritis, he affirmatively waives this argument on appeal. Appellant's Br. at 4 n.2. Accordingly, this issue is not before the Court.

Save for minor alterations not relevant here, section 1110's language has remained the same since 1957 when Congress first enacted this "basic entitlement" provision. *See* Veterans' Benefits Act of 1957, Pub. L. No. 85-86, Title III, § 310, 71 Stat. 83, 96 (codified at 38 U.S.C. § 2310 (1952 ed., 1958 Supp. V)). The act's purpose was to "consolidate," "simplify," and "make more uniform" the various "laws administered by the Veterans' Administration." 71 Stat. at 83. Prior to the 1957 act, the earliest statute the Court could find that directly addresses entitlement is from 1933. There, Congress directed that a pension—the word "compensation" not being used at the time—"may be paid," subject to regulations issued by the Executive Branch, to "[a]ny person who served in the active military or naval service and who is disabled as a result of disease or injury or aggravation of a preexisting disease or injury incurred in line of duty in such service." Act of March 20, 1933, Pub. L. No. 73-2, Title I, § 1(a), 48 Stat. 8, 8.[4]

Mr. Spicer focuses on the word "disability," which he describes as a "broad term." Appellant's Br. at 6 (citing *Saunders v. Wilkie*, 886 F.3d 1356, 1362 (Fed. Cir. 2018)). He contends that "*any* worsening in functional impairment from knee arthritis, manifesting in ways such as . . . decreasing ability to walk and increasing incidence of falls, constitutes a worsening 'disability' under" section 1110. *Id.* at 7-8 (citation omitted). Even accepting this understanding of the word "disability," however, does not sustain the next link in this chain of reasoning—that the statute "does not require worsening in functional impairment to result from the chemotherapy *etiologically*." *Id.* at 8. A current disability and an adequate connection to service are two distinct elements in the "three element test" for disability compensation. *Walker v. Shinseki*, 708 F.3d 1331, 1334 (Fed. Cir. 2012); *see Shedden v. Principi*, 381 F.3d 1163, 1167 (Fed. Cir. 2004) (A veteran seeking compensation "*must still show* the existence of a present disability *and* that there is a causal relationship between the present disability and the injury, disease, or aggravation of a preexisting injury or disease incurred during active duty. (emphasis added)).

B.

We focus on the key part of the phrase "disability resulting from" in section 1110—namely, "resulting from"—and examine whether it is capable of bearing concepts of disability that

---

[4] To implement the 1933 act, President Franklin Roosevelt issued an executive order promulgating Veterans' Regulation No. 1(a), which read in relevant part: "For disability resulting from personal injury or disease contracted in line of duty, or for aggravation of a preexisting injury or disease contracted or suffered in line of duty . . . ." EXEC. ORDER NO. 6156 (June 6, 1933).

We discern no material difference between the phrases "as a result of" and "resulting from."

include the natural progression of a condition not actually caused or aggravated by a service-connected disability but that nonetheless might have been less severe were it not for such disability. Ultimately, we conclude that "resulting from" requires actual causality and so does not encompass such disabilities.

During the period when Congress was enacting and reenacting the basic entitlement statutes, "to result" from something meant "[t]o proceed, spring, or arise, as a consequence, effect, or conclusion" of it. WEBSTER'S NEW INTERNATIONAL DICTIONARY 2126 (2d ed. 1934); *see also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1937 (3d ed. 1961); BLACK'S LAW DICTIONARY 1478 (4th ed. 1957) (both providing the identical definition). This definition has not materially changed since then. *See, e.g.*, *Murakami v. United States*, 398 F.3d 1342, 1351 (Fed. Cir. 2005).

In discussing the plain meaning of the term "results from," the Supreme Court explained that

> [a] thing "results" when it rises as an effect, issue, or outcome from some action, process, or design. "Results from" imposes, in other words, a requirement of actual causality, namely that the causal agent, in some fashion, brings into being the resulting condition. In the usual course, this requires proof that the harm would not have occurred in the absence of—that is, but for

—the thing from which it purportedly results. *Burrage v. United States*, 571 U.S. 204, 210-11 (2014) (internal citations omitted). Indeed, "it is one of the traditional background principles against which Congress legislates that a phrase such as 'results from' imposes a requirement of but-for causation." *Id.* at 214 (internal citation omitted); *see also Brown v. Gardner*, 513 U.S. 115, 119 (1994) (the phrase "as a result of" "impose[s] the requirement of a causal connection").

Given that the phrase "resulting from" has for almost a century plainly expressed a causation requirement, we must reject Mr. Spicer's contention that section 1110 doesn't contain an etiological component. Although the veteran is not explicit, we understand him to use the word "etiology" to refer to "the cause(s) or origin of a disease." *Allen*, 7 Vet.App. at 445 (emphasis omitted). In this light, section 1110's "resulting from" language clearly requires an etiological nexus and that language imposes "a requirement of actual causality." *Burrage*, 571 U.S. at 211. Put another way, Congress's intention to provide compensation only in situations where there's an etiological link between service and a disability's onset or worsening is evident from its use of the phrase "resulting from."

Of course, this congressional choice does not mean that the path to obtaining disability compensation is a narrow one. For example, in *Payne v. Wilkie*, 31 Vet.App. 373, 384 (2019), we explained that the "causation requirement" in the phrase "the result of" was "broad," in that it permitted entitlement to VA benefits "based on a multi-link causal chain." In the 1930 precursor to § 3.310(a), VA recognized the first link when it explicitly permitted compensation for disabilities caused by conditions that were themselves caused or aggravated by service. Then in *Allen*, the Court reasoned that, under section 1110 and § 3.310(a), "when aggravation of a veteran's non-service-connected condition is proximately due to or the result of a service-connected condition, such veteran shall be compensated for the degree of disability (but only that degree) over and above the degree of disability existing prior to the aggravation." 7 Vet.App. at 448. This reasoning followed from *Allen*'s tacit realization that "aggravation is just causation of an increase in disability—i.e., a discrete portion of disability—rather than of the whole disability itself." *Walsh v. Wilkie*, 32 Vet.App. 300, 306 (2020); *see also* 71 Fed. Reg. 52,744, 52,745 (Sept. 7, 2006) (final rule) (promulgating § 3.310(b) and recognizing that "[a]ggravation is a comparative term meaning that a disability has worsened from one level of severity to another"). And another link in the chain was added when VA awarded compensation for a disability caused by the medication a veteran took to treat a service-connected condition. *See Wanner v. Principi*, 17 Vet.App. 4, 8 (2003).

But the breadth of the phrase "resulting from" covers all of these circumstances because, in each, service or a service-related agent *caused* the functional impairment at issue—it brought into being the actual impairment. That something "actually cause the claimant's disability" is "a traditional but-for causation requirement, as opposed to the disability stemming from . . . the natural progress of the claimant's preexisting disease, injury, or condition." *Ollis v. Shulkin*, 857 F.3d 1338, 1343 (Fed. Cir. 2017).

Mr. Spicer's knee arthritis did not, in any reasonable sense of the phrase, "result from" his service-connected cancer or the chemotherapy provided to treat it. There is no contention on appeal that they caused the arthritis or that they made it worse. The current state of his knee functionality is not a consequence or effect of these service-related agents. At most, they interfered with his attempts through affirmative intervention to alter the arthritis's natural progress. Unless we can say that the current state of his arthritis would not exist in the absence of his cancer or chemotherapy, however, there is no actual but-for causation. And but-for causation is what Congress required in section 1110.

C.

It must also be noted that jettisoning the actual causality requirement would effect a radical shift in how disabilities are evaluated. First, it would necessarily require wholly speculative assessments regarding what level of functional impairment might exist if the counterfactual scenario had occurred. Second, and contrary to longstanding practice, it would compensate for the natural progression of disabilities that arose independently from a veteran's service. We briefly address these in turn.

*Speculative Assessments*: VA compensation is concerned with the functional impairment that a veteran suffers, rather than the specific diagnosis assigned to that impairment. *See Saunders v. Wilkie*, 886 F.3d 1356, 1364-68 (Fed. Cir. 2018); *see also Clemons v. Shinseki*, 23 Vet.App. 1, 5 (2009) (noting that veterans seek compensation not for a "particular diagnosis" but for the "affliction" it causes). Under Mr. Spicer's theory, VA would have to resort to conjecture to assess the difference between the current state of his knees and the less-severe state that might otherwise exist if he could undergo the arthroplasty. So, even if we can be reasonably sure that arthroplasty would remove arthritis from the knees, that change alone offers no reliable information regarding the post-surgical functionality of those joints. Put differently, whatever the likelihood of a positive outcome, it remains purely speculative to assume that Mr. Spicer's overall level of knee impairment would necessarily be less after surgery.

Most importantly, there is no mechanism by which the VA can determine the specific level of functional impairment following an intervening procedure or cause. But conjecture or speculation, which is what this theory of service connection requires, cannot serve as the basis for an award of disability compensation. *See, e.g.*, *Jones v. Shinseki*, 23 Vet.App. 382, 390-91 (2010); *Polovick v. Shinseki*, 23 Vet.App. 48, 54 (2009); 38 C.F.R. § 3.102 (2021). This is a clear sign that section 1110 does not permit the award of disability compensation in these circumstances. Because section 1110's "resulting from" language requires actual but-for causation (and, derivatively, aggravation) of the disability at issue, the veteran's challenge to the validity of § 3.310(b) fails.

*Natural Progression*:  Mr. Spicer posits that the only valid aspect of that provision is the part that says "[a]ny increase in severity of a nonservice-connected disease or injury that is proximately due to or the result of a service-connected disease or injury . . . will be service connected." He contends that the Secretary exceeded the scope of *Allen*'s reasoning and contradicted section 1110 when he made ineligible for compensation any increase in severity "due

to the natural progress of the nonservice-connected disease" and established the rubric by which a "baseline level of severity" must be established before aggravation of a non-service-connected condition is accepted. 38 C.F.R. § 3.310(b).

But § 3.310(b) is faithful to *Allen*. Recall we held that, "when aggravation of a veteran's non-service-connected condition is proximately due to or the result of a service-connected condition, such veteran shall be compensated *for the degree of disability (but only that degree) over and above the degree of disability existing prior to the aggravation*." 7 Vet.App. at 448 (emphasis added). In promulgating § 3.310(b), the Secretary explicitly noted this passage and reasoned that, "to determine whether, and to what extent, a service-connected disease or injury has aggravated a non service-connected disability, VA must be able to determine the pre-aggravation severity of the disability in question." 62 Fed. Reg. 30,547, 30,547 (June 4, 1997) (proposed rule). "Since some conditions are inherently progressive and worsen naturally over time," the Secretary specified "that VA will not service-connect any increase in severity that is due to natural progression." *Id.* This approach was "consistent with the manner in which VA determines the degree of in-service aggravation of pre-existing disabilities," that is, "by comparing the severity of the condition when the veteran entered and left active military service and excluding from consideration any increase in severity that is due to the natural progression of the condition." *Id.* at 30,547-48.

*Allen* reached its conclusion based on a close reading of section 1110 and regarded § 3.310(b) as consistent with the statute. Neither section 1110 nor any other statute specifically provides for secondary service connection; the concept is expressly laid out only by regulation. VA, as "an agency that has been granted authority to promulgate regulations necessary to the administration of a program it oversees[,] may fill in gaps in the statutory scheme left by Congress," and a regulation that does so is valid "as long as the agency's action is reasonable and consistent in light of the statute and congressional intent." *Sears v. Principi*, 349 F.3d 1326, 1329 (Fed. Cir. 2003) (internal citations omitted). Or, as *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), put it originally, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[5]

_____

[5] Mr. Spicer cites the statement in *Ward v. Wilkie*, 31 Vet.App. 233, 239 (2019), that § 3.310(b) "is not

9

Section 3.310(b) is consistent with section 1110 and permissibly construes it in conjunction with other statutory principles enunciated by Congress. Section 1110's "resulting from" language, as discussed above, conditions compensation on the actual but-for causation of a disability. The regulation adheres to this formulation by permitting compensation for "[a]ny increase in severity of a nonservice-connected" condition "that is proximately due to *or the result of* a service-connected" condition. 38 C.F.R. § 3.310(b) (emphasis added).[6] And by expressly excluding from compensation any increase in severity "due to the natural progress of the nonservice-connected disease," the regulation simply makes explicit that a disability's affirmative increase in severity (i.e., aggravation) caused by something else differs in kind from the natural worsening of that disability on its own. *See Ollis*, 857 F.3d at 1343 (noting that traditional but-for causation of a disability contrasts with disability stemming from the natural progress of a preexisting condition).

Moreover, the Secretary's deliberate borrowing of the "natural progress" language from section 1153, *see* 62 Fed. Reg. at 30,547, synthesizes two separate but related statutes that address a common issue. "While section 1110 mandates that a veteran be compensated for a preexisting injury that is aggravated in service, section 1153 sets forth how such a veteran establishes that a preexisting condition was aggravated by service, so that he is entitled to the disability compensation benefits authorized by section 1110." *Donnellan v. Shinseki*, 24 Vet.App. 167, 175 (2010) (quotation marks omitted). Congress used two sections to set forth the concept of direct service connection. The Secretary integrated these principles into a single section that lays out secondary service connection. His authority to explicate the whole concept of secondary service connection as it derives from section 1110's "resulting from" language certainly permits him to define the terms he uses in harmony with a standard established by Congress in section 1153.[7]

---

entitled to *Chevron* deference" because it "is not an interpretation of a statute" but "is based on the Secretary's perception of what this Court required in *Allen*." Since the Secretary did not invoke *Chevron* deference in *Ward*, and because a court need not consider *Chevron* where the government decides not to raise it, *see HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021), *Ward*'s statement was simply dicta unnecessary to its holding and is not binding in this case. Although *Allen* was the primary impetus for promulgating § 3.310(b), that case did not resolve all the details addressed in the regulation, and the Secretary—as he was obliged to do— drafted subsection (b) in accordance with section 1110 and other statutory principles.

[6] While the phrase "proximately due to" has always been part of this regulation, *see* note 2, *supra*, we note that the parties do not discuss the role it plays here. Accordingly, we have no occasion to consider that question.

[7] Nothing in *Allen* or *Ward*, it should be noted, directly calls the Secretary's inclusion of the "natural progress" language in § 3.310(b) into question.

Here, the Board concluded that the record did not show that knee arthritis is proximately due to, or the result of, his service-connected leukemia, or that leukemia caused "worsening beyond natural progression" of the veteran's arthritis by his leukemia, "as is required by 38 C.F.R. § 3.310." R. at 6. Mr. Spicer doesn't contend that he is entitled to compensation for arthritis under these criteria. And, despite our authority to "hold unlawful and set aside" regulations that are "not in accordance with law," 38 U.S.C. § 7261(a)(3)(A), we discern no legal infirmity in § 3.310(b). Accordingly, we uphold as valid both § 3.310(b) and, based on that provision, the Board's denial of compensation in this case.

D.

Finally, the sources the veteran cites fall short of recognizing the theory of secondary service connection he now advocates. For instance, it's true that in *Burris v. Principi*, 15 Vet.App. 348, 350-51 (2001), we noted a surviving spouse's theory that the cause of her husband's death—skin cancer—should be deemed connected to service because his exposure to mustard gas while in the Army "prevented normal treatment and cure" of the cancer, as well as the fact that the VA granted that service connection. But the appeal to this Court had nothing to do with that issue, and we did not discuss such a theory of service connection, much less endorse its legal validity. A lone 20-year-old regional office decision does not undermine the foregoing analysis.

Nor does the nonprecedential single-judge decision in *Caton v. Shinseki*, No. 10-2399, 2012 U.S. App. Vet. Claims LEXIS 162 (Feb. 3, 2012). The Court there seemed to accept the viability of a compensation claim premised on the fact that the veteran couldn't ameliorate the pain (and, hence, functional impairment) stemming from his (non-service-connected) multi-joint arthritis because the medication he would use to do so aggravated his (service-connected) duodenal ulcer. *Id.* at *8-11. But the nonprecedential decision doesn't undertake the sort of textual inquiry that we have in this case. In fact, the decision doesn't offer much analysis at all to support its conclusion. Based on its reasoning, *Caton* holds little persuasive value.

The agency actions he invokes are of no help to the veteran either. In a 2017 precedential opinion, the VA general counsel concluded that obesity was not itself a disability for which compensation could be paid but could constitute an "intermediate step" in a theory in which a service-connected disability causes obesity and, in turn, obesity causes another disability. *See Walsh*, 32 Vet.App. at 303. In *Walsh*, we concluded that the general counsel opinion's focus on causation in the first step should not be read as excluding aggravation as a legally relevant

11

consideration, especially since such a reading would be at odds with § 3.310(b). *Id.* at 307. But we were careful to cabin our analysis to the question of whether the general counsel opinion was consistent with § 3.310; we did not address "any other aspect" of the opinion. *Id.* at 306 & n.5.

Mr. Spicer focuses on the causation example used by the general counsel opinion. It suggested that a service-connected disability that caused obesity by preventing a veteran from exercising could form the first link in the nexus chain. *Id.* at 303. Mr. Spicer analogizes this situation to chemotherapy preventing him from obtaining knee surgery, and he argues that he is likewise due compensation. But the key difference in the general counsel's example is that the lack of exercise *caused* something: it brought on obesity or exacerbated it. So, even if the whole opinion interprets the law properly, it doesn't support Mr. Spicer's arguments.

### III. CONCLUSION

Having fully considered the matters raised in this appeal, the Court AFFIRMS the August 2, 2018, Board decision.

ALLEN, *Judge*, dissenting: Luther Spicer served the Nation honorably in the United States Air Force. He is service connected for leukemia. There is no dispute – none at all – that the treatment he underwent for his leukemia has prevented Mr. Spicer from having surgery to treat his bilateral knee condition. Yet, despite these undisputed facts, the majority holds that Mr. Spicer is not entitled to service connection for his knee disability because it was not actually caused by his service or his service-connected leukemia. Because that conclusion is inconsistent with what Congress intended and unnecessarily disserves veterans, I respectfully dissent.

All agree that the key to resolving this appeal is the phrase "[f]or disability resulting from" in section 1110. [8] The majority advances a narrow interpretation of that phrase. In my view, however, the statute sets out a much broader, causation-based standard. And because that is so, I also believe that VA's regulation implementing section 1110, 38 C.F.R. § 3.310(b), improperly limits that language in a way Congress did not intend. Therefore, I would hold that the regulation is not a permissible construction of section 1110.

---

[8] For consistency with the majority's opinion, I too discuss only section 1110 but note that section 1131 is essentially identical and warrants the same analysis.

The "resulting from" language provides for basic causation without limitation and should be interpreted broadly. As the majority points out, our Court considered the phrase "the result of" in *Payne v. Wilkie* in the context of special monthly compensation for a veteran who "as the result of service-connected disability, has suffered the anatomical loss or loss of use of one or more creative organs."[9] The Court held that this language included a "causation" requirement that was broad.[10] The Court relied on the definition of "the result of" as "'naturally read simply to impose the requirement of a causal connection'."[11] Using this broad, causation-based definition of "the result of," the Court held that section 1114(k) did not preclude entitlement to special monthly compensation based on a multi-link chain so long as a claimant was able to meet basic causation requirements.[12]

Similarly, the U.S. Court of Appeals for the Federal Circuit interpreted the phrase "as a result of" as "broad language" of causation in the context of the Civil Liberties Act of 1988.[13] Relying on the dictionary definition of "result" as "'to proceed, spring, or arise as a consequence, effect, or conclusion'," the Federal Circuit held that "as a result of" requires a showing of "a consequence or effect."[14] The court explained that this definition was consistent with the Supreme Court's and other circuit courts' interpretation of the same phrase.[15]

The Federal Circuit was correct that other circuit courts have interpreted the phrase "as a result of" as embodying broad causation principles. For example, the U.S. Court of Appeals for the Tenth Circuit, in interpreting Army regulations to determine whether a crash could be classified as a Department of Defense (DoD) mishap, considered the definition of a mishap, which included the phrase "as a result of DoD operations."[16] Looking at the plain language of the regulation, the

---

[9] 31 Vet.App. 373, 383 (2019) (interpreting 38 U.S.C. § 1114(k)).

[10] *Id.* at 384.

[11] *Id.* (quoting *Brown v. Gardner*, 513 U.S. 115, 119-20 (1994)).

[12] *Id.* at 385.

[13] *Murakami v. United States*, 398 F.3d 1342, 1351 (Fed. Cir. 2005).

[14] *Id.* (quoting *Webster's Third New International Dictionary* 1937 (1993)).

[15] *Id.* at 1351-52 (citing *Black Hills Aviation, Inc. v. United States*, 34 F.3d 968, 975 (10th Cir. 1994) ("The use of the plain language – 'as a result of – is logically interpreted to mean 'caused by.'")).

[16] *Black Hills Aviation, Inc.*, 34 F.3d at 974-75.

court determined that the "as a result of" language logically meant "caused by."[17] Additionally, the U.S. Court of Appeals for the Ninth Circuit looked specifically at the phrase "resulting from" in the context of an immigration regulation administered by the United States Citizenship and Immigration Services (USCIS).[18] Relying on the dictionary definition of "result" as a consequence or "to proceed as an outcome or conclusion," the court found that the phrase in the regulatory provision "a technical violation resulting from inaction of [USCIS]" meant that such a violation occurred "only if the violation is a consequence or effect of USCIS's inaction."[19]

Consistent with all these authorities, it is clear to me that the phrase "resulting from" in section 1110 provides for compensation when a disability is the consequence or effect of military service. Stated another way, the statute's language merely requires that one thing flow from another, namely that a disability flow from military service. Congress imposed no other limitations in connection with establishing service connection beyond this broad, causation-based principle that one thing be a consequence of another.

Congress could have provided other requirements for or limitations on establishing service connection that would have narrowed the scope of the broad "resulting from" language it employed. For example, Congress could have expressly required an etiological relationship between two conditions. It did not do so despite what the majority holds, and it is inappropriate for us to read in any such limitation.[20] "If Congress had intended such a limited effect, it could have crafted a more narrowly tailored statute."[21] It simply is not our place as judges to judicially adopt legislation we might have enacted as legislators.

In fact, we do not just assume that Congress knows how to limit the scope of a causation principle because it did precisely that in 38 U.S.C. § 1153, the statutory provision governing aggravation of a preexisting disability by military service. Although the majority sees the language of section 1153 as supporting its narrower interpretation of the causation required by section 1110, the fact that Congress used more limiting language requiring an "increase in disability" "due to the

---

[17] *Id.* at 975.

[18] *Attias v. Crandall*, 968 F.3d 931 (9th Cir. 2020).

[19] *Id.* at 937.

[20] *Bates v. United States*, 522 U.S. 23, 29 (1997) (noting that "we resist reading words or elements into a statute that do not appear on its face").

[21] *Doyon, Ltd. v. United States*, 214 F.3d 1309, 1316 (Fed. Cir. 2000).

14

natural progress of the disease" to rebut the presumption of aggravation in section 1153 but left it out of section 1110 is telling. When Congress chooses to include limitations in one situation but omits such limitations in another, we can safely assume that it did so intentionally.[22] "Congress plainly knew how to deploy adjectives when it wished to modify the meaning of the word 'cause.'"[23] If it had wanted to impose a requirement such as "beyond the natural progress of the disease" to section 1110, "Congress could readily have inserted such a requirement into the statutory text."[24]

Moreover, this interpretation of "resulting from" as a broad, causation-based principle is not foreign to the law. For example, when causation is a relevant concept under the common law, it tends to be the same consequence-based approach I believe Congress included in section 1110. While I am not suggesting that Congress necessarily had such principles in mind when drafting section 1110 or that it sought to import them into federal law, the fact that these concepts are not revolutionary in the law provides a check of sorts suggesting that my reading is valid.

A prime example of a common law principle embodying the broad causation principle is the "loss of opportunity doctrine." This is "a medical malpractice form of recovery that allows a plaintiff, whose preexisting injury or illness is aggravated by the alleged negligence of a physician or health care worker, to recover for her lost opportunity to obtain a better degree of recovery."[25] "The plaintiff's loss of opportunity injury is an adverse or unintended consequence resulting from the defendant's negligence, error, omission, or failure to diagnose."[26] The question in these types of cases involves whether a "better result" could be achieved but for the action of the defendant.[27] Thus, the doctrine makes clear that, in the medical malpractice context, a plaintiff is not limited to recovering damages only for an action that makes his or her condition worse. Such a plaintiff may also recover damages when an action prevents that person from improving a condition. That

---

[22] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'.") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972).

[23] *Viegas v. Shinseki*, 705 F.3d 1374, 1383 (Fed. Cir. 2013).

[24] *Id.*

[25] *Lord v. Lovett*, 770 A.2d 1103, 1104-05 (N.H. 2001).

[26] *Id.* at 1106.

[27] *See Holton v. Memorial Hosp.*, 679 N.E. 2d 1202 (Ill. 1997).

causation-based principle is entirely consistent with the interpretation of "resulting from" I have discussed.

Another concept that is instructive relates to the mitigation of damages in torts. Generally, a plaintiff has a duty to seek medical treatment or follow a doctor's recommendation to minimize his or her damages, including a duty to submit to surgery if that surgery would reduce the plaintiff's damages.[28] The notion is that a defendant should not be held responsible for consequences of an act after the point at which a reasonable person would be able to make a condition better or stop it from getting worse. However, when a victim of a wrongful act cannot take such steps, the duty to mitigate damages does not prevent recovery.[29] In these cases, a defendant would still be liable for the continued consequences of the wrongful act despite the plaintiff's failure to mitigate his or her damages because of the consequence-based principles of causation.[30]

These two doctrines illustrate two important points in this case. First, a broad understanding of causation is common under the law and has been read to include the loss of a better result in addition to the worsening of a condition in other contexts. Second, this construction of causation raises the question why Congress would provide a narrower conception of causation for veterans – a most favored class of citizens[31] – than is provided for other classes of claimants, such as medical malpractice or federal civil rights plaintiffs. The majority's narrow construction of causation for veterans does not fit with the way Congress has legislated veteran's law throughout its history. Thus, a broader definition of causation under section 1110 is warranted.

Because I interpret causation under section 1110 as requiring nothing more than that one thing flow from another, I also disagree with the majority's holding that VA's implementing regulation, 38 C.F.R. § 3.310(b), is consistent with section 1110. In adopting § 3.310, the Secretary expressly acknowledged that his authority flowed from section 1110.[32] Thus, we must ensure that the Secretary has not exceeded that authority in implementing § 3.310(b) given the meaning of section 1110. As discussed above, I read section 1110 as clear about what is required to establish

---

[28] *See Quillette v. Sheerin*, 297 Mass. 536, 543, 9 N.E.2d 713, 717 (Mass. 1937).

[29] *Baglio v. New York C. R. Co.*, 344 Mass. 14, 180 N.E.2d 798 (Mass. 1961).

[30] *See Stark v. Shell Oil Co.*, 450 F.2d 994 (5th Cir. 1971).

[31] *See Skaar v. Wilkie*, 32 Vet.App. 156, 181 (2019) (citing *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 441 (2011)).

[32] *See* 62 Fed. Reg. 30,547 et seq. (Jun 4, 1997); 71 Fed. Reg. 52,744 (Sept. 7, 2006).

service connection for compensation purposes: that a disability flow from, or is a consequence or effect of, military service. For me, "that is the end of the matter."[33]

Section 3.310(b) inappropriately imposes limitations on the broad causation-based standard Congress set out in section 1110. The regulation begins by providing that "any increase in severity of a nonservice-connected disease or injury that is proximately due to or the result of a service-connected disease or injury" is subject to service-connected compensation.[34] This provision of the regulation is entirely consistent with the scope of section 1110's broad "resulting from" language. In fact, this Court in *Walsh* held that this language in § 3.310(b) "is essentially identical" to the language in § 3.310(a), governing secondary service connection on a direct basis using essentially express causation language.[35] The Court noted that "aggravation is just causation of an increase in disability – i.e., a discrete portion of disability – rather than of the whole disability itself."[36] In sum, *Walsh* confirms that the causation element in § 3.310(b) is consistent with section 1110.

However, there is more in the regulation. Section 3.310(b) also requires that the increase is "not due to the natural progress of the nonservice-connected disease." But this "natural progress" language is inconsistent with section 1110 because it places an extra requirement, or limitation, on top of the broad causation requirement articulated in the statute. "['R]egulations must, by their terms and in their application, be in harmony with the statute. A [r]egulation which is in conflict with or restrictive of the statute is, to the extent of the conflict or restriction, invalid.'"[37] Under the statute, if a service-connected disability prevents a veteran from making a non-service-connected condition better, the non-service-connected condition's lack of improvement "result[s] from" military service under bedrock causation principles. Yet, under the regulation, the non-service-connected condition could not merit compensation because it would not be worse than it would

---

[33] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984); *see Welcome v. Wilkie*, 33 Vet.App. 77, 80 (2020) (articulating the analytical framework for applying *Chevron*).

[34] 38 C.F.R. § 3.310(b).

[35] *Walsh v. Wilkie*, 32 Vet.App. 300, 305 (2020).

[36] *Id.* at 306.

[37] *Citizen's National Bank of Waco v. United States*, 417 F.2d 675, 679 (5th Cir. 1969) (quoting *Scofield v. Lewis*, 251 F.2d 128, 132 (5th Cir. 1958)); *see also Crumlich v. Wilkie*, 31 Vet.App. 194, 203 (2019); *Staab v. McDonald*, 28 Vet.App. 50, 55 (2016).

have been without military service. VA cannot through § 3.310(b) take away what Congress provided in section 1110.

Another factor highlights why the "natural progress" language is inconsistent with section 1110 and is perhaps where my view diverges most starkly from the majority. Specifically, the fact that this language comes from an entirely different statutory provision – section 1153 – than that which authorized the regulation is troubling. In connection with the adoption of § 3.310(b), the Secretary acknowledged that the language we are discussing came from 38 U.S.C. § 1153.[38] In proposing the regulation, the Secretary noted:

> Since some conditions are inherently progressive and worsen naturally over time, we propose to specify that VA will not service-connect any increase in severity that is due to natural progression. These requirements would be consistent with the manner in which VA determines the degree of in-service aggravation of preexisting disabilities.[39]

Later in adopting the final version of the regulation, VA explained that it referenced section 1153 to provide an example for how an aggravation analysis could work under §3.310(b).[40]

What this means is that to implement the broad causation-based "resulting from" language in section 1110, VA imported language from a different statute, one that Congress enacted with a far narrower causation principle. In doing so, the Secretary acted inappropriately, only reinforcing why the "natural progress" language in § 3.310(b) is not a "permissible construction" of section 1110.[41] While the majority views this importation of language from section 1153 as bolstering § 3.310(b) as a "deliberate borrowing" of language that "synthesizes two separate but related statutes that address a common issue,"[42] nothing in the Secretary's adoption of § 3.310(b) tells us that section 1153 has any bearing on secondary service connection. Thus, I disagree with the majority's reliance on section 1153 to support its interpretation of the regulation as a valid construction of section 1110 under the Secretary's authority. I simply do not see how one can support the propriety of narrowing section 1110's "resulting from" standard by adopting a

---

[38] 62 Fed. Reg. 30,547, 30,547 (Jun 4, 1997).

[39] *Id.*

[40] 71 Fed. Reg. 52,744 (Sept. 7, 2006).

[41] *See Chevron*, 467 U.S. at 844.

[42] *See supra* at 10.

regulation that quotes a different statutory provision in which Congress chose to use more limited language of causation.

Turning to the facts of this case, I would reverse the Board's finding that secondary service connection for appellant's bilateral leg disabilities was not warranted. The parties agree that appellant has a bilateral knee condition for which he cannot receive surgery due to low hemocrit levels caused by chemotherapy to treat his service-connected leukemia.[43] In other words, there is no dispute that (1) appellant has a service-connected condition, leukemia; (2) appellant has a non-service-connected condition, a bilateral knee condition; and (3) the reason that appellant cannot make his knee condition better (or perhaps stop it from getting worse as it would in its natural condition) is the treatment he receives for his service-connected leukemia. Additionally, as discussed above, the Board's legal conclusion that "[t]he inability to undergo knee replacement surgery because of the effects of his service-connected leukemia is not contemplated by the applicable laws or regulations to fall within the meaning of secondary service connection"[44] is wrong. Because the facts are not in dispute and the law does not prohibit service connection on the theory appellant asserts, I would reverse the Board's decision denying service connection for appellant's bilateral knee condition as secondary to his service-connected leukemia and remand for VA to award Mr. Spicer what he is due.[45]

The majority is concerned about the speculative nature of assessing appellant's level of knee impairment due to his inability to have surgery.[46] Although I agree that such an assessment may be complex, VA adjudicators address complex issues every day with the evidentiary tools at their disposal. For example, often adjudicators turn to medical examiners to provide expert opinions on a veteran's degree of disability at some time in the past, when the examiner would not have had the benefit of a full contemporaneous examination to make that determination. Yet medical examiners review the evidence of record and provide their most informed recommendations. Adjudicators then look for competent, credible evidence to support causation or disability levels and weigh the evidence to reach a conclusion. Those evidentiary determinations

---

[43] R. at 23.

[44] *Id.*

[45] *See Johnson v. Brown*, 9 Vet.App. 7, 10 (1996) ("[W]hen the only permissible view of the evidence is contrary to that found by the [Board], reversal is the appropriate remedy."); *see also Deloach v. Shinseki*, 704 F.3d 1370, 1380 (Fed. Cir. 2013); *Gutierrez v. Principi*, 19 Vet.App. 1, 10 (2004).

[46] *See supra* at 8.

are subject to deference upon review in this Court. None of those things change under my interpretation of § 3.310(b).

Additionally, secondary service connection by its nature requires complex causation analyses, and limiting secondary service connection only to conditions that cause a condition to worsen as opposed to preventing it from getting better would not eliminate that complexity. For example, the Court and VA's General Counsel have both recognized that obesity may be a link in a chain of causation connecting a non-service-connected condition to a service-connected condition.[47] That principle injects complexity into the analysis because, whenever one allows a chain of causation to satisfy a standard, the analysis will become more complicated than when the law requires a more "direct" relationship.

My point is that a broader definition of causation does not create any complexity in adjudication that is not already present in the system. In fact, Mr. Spicer's case does not actually present a complex causal chain at all. His cause and effect theory is as direct as one could imagine. Here, there is no dispute about Mr. Spicer's inability to undergo knee surgery because of treatment and symptoms related to his service-connected leukemia. That is not likely to be true for every case about the inability to improve a condition. But if there was a dispute, the Board could resolve it in its role as factfinder as it does all the time with factual questions ranging from the simple to the complex.

Finally, the majority is concerned with what it deems a "radical shift" in how disabilities are evaluated under a broader interpretation of causation than it adopts.[48] However, both the Supreme Court and Federal Circuit have warned against courts relying on policy considerations when the law is clear. The Supreme Court has explained that "'even the most formidable' policy arguments cannot 'overcome' a clear statutory directive."[49] Instead, the Supreme Court noted that "this Court's task is to discern and apply the law's plain meaning as faithfully as we can, not 'to assess the consequences of each approach and adopt the one that produces the least mischief.'"[50]

---

[47] *See Walsh*, 32 Vet.App. at 302; *see also* VA Gen Coun. Prec. 1-2017 (Jan. 6, 2017).

[48] *See supra* at 8.

[49] *BP P.L.C. v. Mayor and City Council of Baltimore*, __ U.S. ___, ___, 141 S.Ct. 1532, 1542, 209 L.Ed.2d 631 (2021) (quoting *Kloeckner v. Solis*, 568 U.S. 41, 56, n.4 (2012)).

[50] *Id.* (quoting *Lewis v. Chicago*, 560 U.S. 205, 217 (2010)).

The Federal Circuit recently emphasized this point in the context of regulatory interpretation when it rejected this Court's decision in *Turner v. Shulkin*[51] that had articulated a "triggering principle" with respect to the constructive receipt doctrine in the context of 38 C.F.R. § 3.156(b).[52] We had imposed a "triggering principle" based in large part because of what we feared could be a negative impact on VA's adjudicative process as a practical matter.[53] The Federal Circuit rejected such practicality-based means of interpretation (there of a regulation as opposed to a statute), holding that there was "no legal basis for adding such a requirement."[54] Thus, the Federal Circuit made clear that there is no room for policy concerns when the law is clear – we are bound by the law. The majority seems to fall into this trap in its interpretation of section 1110 and § 3.310(b) here.

In sum, I believe that our Nation's veterans are entitled to the broad definition of causation Congress provided. Because Congress intended a broad understanding of causation to establish service connection under section 1110, it was improper for VA to limit it by imposing restrictions found in a different statutory provision. Thus, § 3.310(b) is not a permissible construction of the statute. Given my understanding of the governing law and the undisputed facts of this case, I would reverse the Board's denial of secondary service connection for appellant's bilateral leg disability. Because the majority reaches a different conclusion, one at odds with what Congress sought to do, I respectfully dissent.

---

[51] 29 Vet.App. 207 (2018).

[52] *Lang v. Wilkie*, 971 F.3d 1348 (Fed. Cir. 2020).

[53] *Turner*, 29 Vet.App. at 217.

[54] *Lang*, 971 F.3d at 1355.